**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **BRIAN MOHR,** | : | **Case No. 2:19-cv-00150-JTM-JPK** |
| | : | |
| **Plaintiff,** | : | **Judge James T. Moody** |
| | : | |
| **vs.** | : | **Magistrate Judge Joshua P. Kolar** |
| | : | |
| **NEWREZ, LLC, f/k/a NEW PENN** | : | |
| **FINANCIAL, LLC, d/b/a** | : | **DEFENDANT'S MOTION TO** |
| **SHELLPOINT MORTGAGE** | : | **DISMISS AMENDED COMPLAINT** |
| **SERVICING,** | : | |
| | : | |
| **Defendant.** | : | |

Defendant NewRez LLC, f/k/a New Penn Financial, LLC, d/b/a Shellpoint

Mortgage Servicing ("Shellpoint"), respectfully moves the Court to dismiss Plaintiff

Brian Mohr's ("Mohr") *Amended Complaint*[1] under Fed.R.Civ.P. 12(b)(6). The

Complaint fails to state a claim upon which this Court may grant relief. Shellpoint

supports this Motion with the following Memorandum, the pleadings, and the

documents Mohr relies upon in his Complaint.

Respectfully submitted,

OF COUNSEL:

*/s/ Jeffrey J. Hanneken*
Jeffrey J. Hanneken (31726-15)
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45202
Phone: (513) 621-6464
Fax:    (513) 651-3836

*Counsel for Defendant NewRez, LLC, f/k/a*
*New Penn Financial, LLC d/b/a Shellpoint*
*Mortgage Servicing*
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-0349
Fax:    (513) 651-3836
E-mail: jhanneken@graydon.law

---

[1] Filed July 1, 2019, at Doc. 16.

## MEMORANDUM IN SUPPORT

### I.     INTRODUCTION

Mohr alleges that Shellpoint violated the FDCPA when it sent him three letters. Those letters merely informed him that his property insurance lapsed, warned him that the insurance Shellpoint obtained would be much more expensive, and advised him that the premiums would be assessed to his mortgage loan. Federal law required Shellpoint to send Mohr these letters. It also required that these letters include the specific language that Mohr alleges is misleading.

Several other courts have previously analyzed very similar letters. Those courts found that the letters were not an attempt to collect a debt, and thus did not violate the FDCPA, so long as they included a bankruptcy disclaimer. Shellpoint thus asks this Court to follow this unanimous precedent court and dismiss the Complaint.

Mohr also alleges that Shellpoint breached two contracts – the mortgage and the parties' settlement agreement from his 2018 lawsuit against Shellpoint. Shellpoint asks the Court to decline supplemental jurisdiction over those state law claims, as this Court lacks independent jurisdiction over those claims.

### II.    STATEMENT OF FACTS

#### A.     Mohr's Bankruptcy

Plaintiff Brian Mohr obtained a mortgage loan ("Mortgage Loan") secured by the real property in Merrillville, IN ("Property").[2] He subsequently filed a Chapter 7 bankruptcy, which discharged his personal obligations on the Mortgage Loan.[3] After the

---

[2] Complaint, ¶15.
[3] *Id.*

2

bankruptcy, Mohr remained the owner of the Property, and the Mortgage[4] remained of record.

### B.    Mohr's 2018 Lawsuit Against Shellpoint.

Shellpoint subsequently began servicing Mohr's Mortgage Loan.[5] Mohr filed another lawsuit in this Court, alleging that Shellpoint violated the FDCPA when it sent letters that ostensibly attempted to collect the discharged debt ("2018 Case").[6]  The 2018 Case settled in August 2018.[7]

### C.    The Currently Pending Foreclosure.

As part of the Settlement, Mohr agreed to accept service and cooperate with the forthcoming foreclosure.[8] Three weeks later, Shellpoint filed a foreclosure action in state court ("Foreclosure").[9] Mohr consented to the *in rem* foreclosure judgment entered in March 2019.[10]

### D.    Shellpoint's Hazard Insurance Notices Sent To Mohr.

Mohr bases his FDCPA claim in this case on three letters Shellpoint sent him. These letters are dated February 19, 2019 ("First Warning Letter"),[11] March 21, 2019

---

[4] A copy of the Mortgage is attached hereto as <u>Exhibit A</u>. The Mortgage is extrinsic evidence, but is proper on a Motion to Dismiss because Mohr relied upon this document in his Complaint. *See Avila v. Bronger Masonry, Inc.*, S.D. Ind. No. 1:14-cv-913-JMS-DKL, 2014 U.S. Dist. LEXIS 103742, at *6 (July 30, 2014), citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("There is an exception for which the Court can consider materials attached to a motion to dismiss without converting it to a summary judgment motion, but it is reserved for 'concededly authentic document[s] central to the plaintiff's claim,' such as the contract in a breach of contract case.").

[4] Complaint, Exhibit A.

[5] *Id.*

[6] *Id., at* ¶17.

[7] Complaint, ¶18.

[8] Complaint, ¶19.

[9] *NewRez LLC*, f/k/a New Penn Financial, LLC, v. Brian K. Mohr, *et al.*, Lake County, Indiana Superior Court, Division 1, Case No. 45D01-1810-MF-000482.The Court may take judicial notice of the Foreclosure. See, e.g., *Kolano v. Bank of Am.*, N.D. Ohio No. 5:13-cv-00832, 2014 U.S. Dist. LEXIS 35844, at *5-6 (Mar. 19, 2014).

[10] Complaint, ¶23.

[11] Complaint, Exhibit A.

("Second Warning Letter"),[12] and April 8, 2019 ("Final Letter")[13] (collectively, the "Letters").

The first two Letters[14] contained nearly identical language, informing Mohr that:

> [O]ur records show that your homeowner's association (HOA) hazard insurance expired, and we do not have evidence that your homeowner's association has obtained new coverage. **Because homeowner's association (HOA) hazard insurance is required on your property, we plan to buy insurance for your property.** You must pay us for any period during which the insurance we buy is in effect but you do not have insurance.
>
> You should immediately provide us with your insurance information. We urge you to contact your Homeowner's Association to obtain current evidence of homeowner's association (HOA) hazard insurance for your property referenced above.

Both the First Warning Letter and the Second Warning Letter provided the procedure for Mohr to submit proof of insurance. But they did *not* reference Mohr's default on the Mortgage Loan, the amount due on the Mortgage Loan, the Foreclosure, any options or programs to settle the debt or avoid foreclosure, or any procedure to make payment on the Mortgage Loan.

And the first two Letters contained the following bankruptcy disclaimer:[15]

> To the extent that your obligation has been discharged or is subject to an automatic stay of bankruptcy **this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect such obligation**.

Having received no response, Shellpoint sent the Final Letter advising Mohr that it had to obtain lender-placed insurance, that it would charge the premium to the Mortgage Loan escrow account, and that Shellpoint would cancel the lender-placed

---

[12] Complaint, Exhibit B.
[13] Complaint, Exhibit C.
[14] First Warning Letter and Second Warning Letter (emphasis original).
[15] *Id.* (emphasis added).

4

insurance upon proof that he obtained his own insurance coverage.[16] The Final Letter contained the price of the premium, but advised that "This is not an invoice."[17]

Mohr alleges that the Letters "harassed and inconvenienced him,"[18] so in response he filed this lawsuit. The Complaint essentially alleges that Mohr is worried that Shellpoint *might* try to hold him personally liable in the future, and that he *might* have to spend attorney's fees to defend himself if that happens.[19] He then suggests how he would have drafted the Letters differently.[20] This argument is perhaps better reserved for Congress, as federal law requires servicers like Shellpoint to include the various disclaimers and language that Mohr finds "confusing and misleading."

But the question before the Court is not whether the Letters were an exemplar of clarity. The question is whether they were an attempt to collect a debt that triggered the FDCPA. They were not. Shellpoint thus asks the Court to dismiss the Complaint.

## III.   LAW AND ARGUMENT

### A.   The Motion to Dismiss Standard Under Rule 12.

The current standard governing a motion to dismiss requires:[21]

> First, the complaint must describe the claim in sufficient detail to give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests" . . . Second, its allegations must plausibly suggest that the plaintiff has a right to relief raising the possibility above a "speculative level"; if they do not, the plaintiff pleads itself out of court.

---

[16] Complaint, Exhibit C.
[17] *Id.*
[18] Complaint, ¶27.
[19] Complaint, ¶27.
[20] Complaint, ¶31.
[21] *Gordy v. Coffman (In re Gordy)*, Case No. 16-11304, 2016 Bankr. LEXIS 4555, at *2 (Bankr.N.D.Ind. Nov. 28, 2016), citing *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F. 3d 773, 776 (7th Cir. 2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L. Ed. 2d 929) (internal citations omitted). See also, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009); *In re Eisaman*, 387 B.R. 219, 222 (Bankr. N.D. Ind. 2008); *In re Schmucker*, 376 B.R. 256, 258 (Bankr. N.D. Ind. 2007).

In making the determination, the Court accepts the factual allegations in the complaint as true and draws all reasonable inferences in plaintiff's favor.[22] But any "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."[23] And the plaintiff must allege facts demonstrating a plausible claim for relief in order to survive a motion to dismiss.[24]

### B.   Mohr's FDCPA Claim in Count One Fails Because Shellpoint Did Not Send The Letters In An Attempt To Collect A Debt.

#### 1.   The FDCPA Only Applies To Communications Sent "In Connection With The Collection Of Any Debt."

In order for the FDCPA to even apply, the plaintiff must meet two threshold criteria. First, the FDCPA applies to *debt collectors*. Shellpoint concedes for purposes of this Motion that it is a *debt collector* under 15 U.S.C. §1692a(6). Second, the debt collector must send the communication that forms the basis of the suit "in connection with the collection of any debt." See 15 U.S.C. §§1692e,[25] 1692f.[26] So the plaintiff cannot merely show that the defendant acts as a *debt collector* vis-à-vis the plaintiff and sent a letter. If the subject communications are not for the purpose of collecting a debt, then the FDCPA does not apply.[27] And by extension, the false or misleading nature of the communication is irrelevant if the communication itself is not is not an attempt to collect a debt in the first place.

---

[22] *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 457 (7th Cir. 2007).

[23] *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

[24] *Twombly*, 550 U.S. at 555-56, 127 S.Ct. at 1965-65.

[25] 15 U.S.C. §1692e ("A debt collector may not use any false, deceptive, or misleading representation or means *in connection with the collection of any debt*.") (emphasis added).

[26] 15 U.S.C. §1692f ("A debt collector may not use unfair or unconscionable means *to collect or attempt to collect any debt*.") (emphasis added).

[27] *Id.*

The FDCPA does not define the phrase "in connection with the collection of any debt." However, the courts have articulated a "flexible, common sense inquiry" to make that determination.[28] The inquiry is objective, and not subject to the normal "unsophisticated consumer standard" used to evaluate FDCPA claims.[29] The first and most obvious factor is whether the communication takes the form of a demand for payment.[30] This typically requires some combination of an explicit demand for payment on a specific amount, the due date, and the procedure to make a payment such as a payment coupon.[31] The second factor is the nature of the parties' relationship and the "purpose and context of the communication."[32]

Debt collectors send many communications that are *informational* rather than an attempt to collect a debt. Federal law often requires these *informational* communications, such as the following:

- the initial "welcome letter" that notifies the borrower of the servicing transfer;[33]

- an invitation to engage in a loss mitigation program to avoid foreclosure;[34]

- a letter regarding the status of the account that warns about the effects of future missed payments; and,[35]

---

[28] *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384 (7th Cir. 2010).

[29] *See  Ruth v. Triumph P'ships*, 577 F.3d 790, 798 (7th Cir. 2009).

[30] *See Bailey v. Security Nat'l Servicing Corp.*, 154 F.3d 384, 388-389 (7th Cir. 1998).

[31] *See, e.g., Shelley v. Ocwen Loan Servicing, LLC, S.D.Ind. No. 1:13-cv-506-RLY-DKL, 2013 U.S. Dist. LEXIS 122439, at *13 (Aug. 28, 2013)* ("[m]ost importantly, it is axiomatic that for a demand of money to be made, the recipient of the demand must be informed what amount is owed.").

[32] *See Simpson v. Safeguard Properties, L.L.C.*, 2013 U.S. Dist. LEXIS 82408, 2013 WL 2642143, at *3 (N.D. Ill. June 12, 2013) (citing *Gburek*, 614 F.3d at 385).

[33] *Thompson v. BAC Home Loans Servicing, L.P.*, No. 2:09-cv-311, 2010 U.S. Dist. LEXIS 30891, 2010 WL 1286747 (N.D. Ind. 2010) (Notice of servicing transfer was not in connection with an attempt to collect a debt despite fact that the notice also provided the payment remittance address of the defendant, payment instructions, a payment coupon with the amount due, and information about optional insurance).

[34] *Gillespie v. Chase Home Fin., LLC*, No. 3:09-cv-191-TS, 2009 U.S. Dist. LEXIS 108837, 2009 WL 4061428, at *6 (N.D. Ind. Nov. 20, 2009) (workout letters did not require the debtor to make any payments on delinquent loan, but merely informed debtors of options available to them to resolve the delinquency).

[35] *Bailey v. Sec. Nat'l Servicing Corp.*, 154 F.3d 384, 389 (7th Cir. 1998) ("A warning that something bad might happen if payment is not kept current is not a dun, nor does it seek to collect any debt, but rather

- a letter acknowledging that the debtor is no longer represented by counsel.[36]

And most relevant this case, as discussed below, courts appear to have unanimously found hazard insurance notices like the Letters that Shellpoint sent to be *informational* rather than an attempt to collect.

### 2.   Shellpoint's Letters Were *Informational,* And Not An Attempt To Collect A Debt.

The Letters upon which Mohr bases his FDCPA claim were *informational* communications rather than an attempt to collect a debt. Federal law required Shellpoint to send the Letters informing Mohr that his insurance coverage lapsed before it could obtain force-placed insurance. The few courts that have addressed these communications found them to be *informational* rather than an attempt to collect a debt. These cases generally arose in the bankruptcy context, with borrowers like Mohr seeking to characterize the letters as an attempt to collect a debt that was discharged in a prior bankruptcy.

And the bankruptcy context is significant. Mohr bases his FDCPA claim on the fact that he discharged any personal liability on the Mortgage Loan in his bankruptcy.[37] This is true. But Mohr remained the Property owner, and Shellpoint's *in rem* mortgage rights remained after the bankruptcy discharge.[38] Those rights include the right to hold

---

the opposite because it tries to prevent the circumstance wherein payments are missed and a real dun must be mailed.").

[36] *Brand v. Caliber Home Loans, Inc.,* N.D.Ill. No. 16-cv-03432, 2018 U.S. Dist. LEXIS 173129, at *16 (Oct. 9, 2018).

[37] Complaint, ¶31.

[38] *Henriquez v. Green Tree Servicing, LLC (In re Henriquez),* 536 B.R. 341, 345 (Bankr.N.D.Ga.2015), citing *In re Mele,* 486 B.R. 546, 555 (Bankr. N.D. Ga. 2013), and *In re Gill,* 529 B.R. 31, 37 (Bankr. W.D.N.Y. 2015) (internal citations omitted) ("Although a discharge eliminates the debtor's personal liability on a secured debt, the discharge does not eliminate a secured creditor's lien against the property. Thus a secured creditor may still enforce its lien against the debtor's property after a discharge, but may not demand payment from the debtor personally. The discharge injunction does not prohibit every communication between a creditor and debtor—only those designed to collect, recover or offset any such debt as a personal liability of the debtor.").

8

Mohr responsible for hazard insurance and recover the costs of obtaining such insurance from the foreclosure sale proceeds.[39]   As one court has explained in the post-bankruptcy context:[40]

> Forces remain[] at work that c[an] make . . . continued ownership of the real estate uncomfortable — forces like accruing real estate taxes and the desirability of maintaining liability insurance for the premises. But those forces are incidents of ownership. Though the [Bankruptcy] Code provides debtors with a surrender option, it does not force creditors to assume ownership or take possession of collateral. And although the Code provides a discharge of personal liability for debt, it does not discharge the ongoing burdens of owning property.

Shellpoint acknowledges that it cannot enforce Mohr's obligation to maintain hazard insurance against him personally. And it did not attempt to do so. But if, for instance, the Property sells at a foreclosure sale for more than the amount owed on the mortgage, Shellpoint may offset its cost of force-placed hazard insurance against the surplus that Mohr or other lienholders would otherwise receive.[41] And in order to recover its *in rem* mortgage rights against the Property, federal law required Shellpoint to send Mohr the Letters.

### (a)    Federal Law Requires Mortgage Servicers To Send Insurance Notices Before Obtaining Force-Placed Insurance Policies.

Federal law — RESPA[42] and Regulation X[43] - compelled Shellpoint to send the Letters and include the language to which Mohr objects. Mohr thus seeks to hold Shellpoint liable under one federal law - the FDCPA - for sending the Letters that it was required to send under other federal laws.

---

[39] *Thomas v. Seterus Inc. (In re Thomas)*, 554 B.R. 512, 521 (Bankr.M.D.Ala.2016).
[40] *Canning v. Beneficial Maine, Inc. (In re Canning)*, 442 B.R. 165, 172 (Bankr. D. Me. 2011).
[41] *In re Henriquez)*, 536 B.R. at 348.
[42] The Real Estate Settlement Procedures Act, 12 U.S.C. §§2601 *et seq*. ("RESPA").
[43] Regulation X of the Bureau of Consumer Financial Protection, 12 C.F.R. §§1024.41 ("Regulation X").

RESPA provides that "[a] servicer may not impose any charge on any borrower for force-placed insurance with respect to any property securing a federally related mortgage unless" the servicer sends two written notices to the borrower containing the following information:[44]

    (i)    a reminder of the borrower's obligation to maintain hazard insurance on the property securing the federally related mortgage;

    (ii)    a statement that the servicer does not have evidence of insurance coverage of such property;

    (iii)    a clear and conspicuous statement of the procedures by which the borrower may demonstrate that the borrower already has insurance coverage; and

    (iv)    a statement that the **servicer may obtain such coverage at the borrower's expense** if the borrower does not provide such demonstration of the borrower's existing coverage in a timely manner.

And Regulation X requires the notice to contain specific language that the borrower will have to pay for such coverage by including "[a] statement that hazard insurance is required on the borrower's property, and that the servicer has purchased or will purchase . . . such insurance at the borrower's expense."[45]

As a result, RESPA required Shellpoint to send the Letters. And Regulation X required the Letters to include the very language upon which the Plaintiff bases his claims. In that situation, Shellpoint can do nothing more to avoid the appearance that the communications are an attempt to collect a debt than include a bankruptcy disclaimer. Which it did.

---

[44] 12 U.S.C. § 2605(*l*)(1)(A)-(B) (emphasis added).
[45] 12 C.F.R. § 1024.37(c)(2)(vi).

## (b)   Hazard Insurance Letters Are Informational And Not An Attempt To Collect A Debt.

Shellpoint is not the first mortgage servicer caught between RESPA and Regulation X's dual mandates to send the Letters, on the one hand, and the FDCPA's mandate that it not attempt to collect a discharged debt against the debtor personally, on the other hand. Fortunately, the courts that have analyzed the issue have uniformly found a hazard insurance letter is not an attempt to collect a debt.

In *Preuher v. Seterus, LLC*,[46] the district court granted the defendant's motion to dismiss because the letters advising the debtor of the mortgage's requirement that the property be insured was not sent in connection with an attempt to collect a debt. The court found that while the letter mentioned costs associated with the lender purchasing insurance, it did not demand payment.[47]  The purpose and context of the letter clearly indicated it was not an effort to collect a debt because it did not in any way discuss the balance of the mortgage debt. Instead, the lender intended for the letter to provide notice to the debtors about potential insurance costs.

Similarly, in *Thomas v. Seterus, Inc. (In re Thomas),[48]* the mortgage servicer sent letters nearly identical to those Shellpoint sent to Mohr, including language that the force-placed insurance would be more expensive than obtaining other coverage, and that the borrower "must pay us" for insurance the lender obtained on the property. The *Thomas* court dismissed the case, finding that the hazard insurance letters were for compliance purposes rather than an attempt to collect a debt.[49] The court reasoned that

---

[46] *Preuher v. Seterus, LLC*, 2014 U.S. Dist. LEXIS 171139, 2014 WL 7005095, at *2-3 (N.D. Ill. Dec. 11, 2014).
[47] *Id.* at *2.
[48] *Thomas v. Seterus Inc. (In re Thomas)*, 554 B.R. 512, 523 (Bankr.M.D. Ala. 2016).
[49] *Thomas*, 554 B.R. at 523 ("When a debtor places a mortgagee's collateral at risk by failing to abide by the terms of the mortgage, the mortgagee has a valid purpose in offsetting its cost of protecting the

11

RESPA required the creditor to give notice to the borrower of what it was about to do, and so long as the notice contains a bankruptcy disclaimer, it is not an "act to collect" discharged debt from the debtor.[50]

The *Thomas* court based its decision on *Henriquez v. Green Tree Servicing,*[51] where the court found hazard insurance letters to be informational rather than an attempt to collect because they were sent in accordance with RESPA and contained bankruptcy disclaimers. While the letters contained language that the borrower would be responsible for the cost of the insurance, the letters also contained bankruptcy disclaimers stating that the defendant was not attempting to collect against the borrower personally due to the bankruptcy discharge.[52]

And the other courts that have addressed the issue overwhelmingly, if not unanimously, follow *Henriquez*, finding those notices informational and not an attempt to collect a debt so long as they contained a bankruptcy disclaimer.[53]

---

collateral against the debtor's equity in the collateral, and the mortgagee's necessary compliance with RESPA toward that end likewise falls within that purpose…. Of course, due to the coercive nature of the language RESPA and Regulation X requires in these situations, inclusion of a prominent, unambiguous, and explanatory bankruptcy disclaimer within these letters is necessary to prevent the letters from running afoul of the automatic stay.").

[50] *Id.* at 523.

[51] *In re Henriquez*, 536 B.R. at 348.

[52] *Id.*

[53] *See Elliott v. PHH Mtge. Corp.*, N.D.N.Y. No. 15-CV-01221(BKS), 2017 U.S. Dist. LEXIS 131885 (Mar. 3, 2017) (mailings regarding hazard insurance with bankruptcy disclaimer is not an attempt to collect a debt); *In re Prisco*, Bankr.N.D.N.Y. No. 07-13408, 2017 Bankr. LEXIS 2271, at *22 (Aug. 14, 2017)(bankruptcy disclaimers on hazard insurance letters are not an attempt to collect a debt); *Lovegrove v. Ocwen Loan Servicing, LLC*, W.D.Va. Civil Action No. 7:14cv00329, 2015 U.S. Dist. LEXIS 112768, at *34 (Aug. 25, 2015) (multiple correspondence, including hazard insurance letters, were informational and non-threatening in nature and contained disclaimers that if the debt was in bankruptcy the communications were not an attempt to collect a debt); *Alhassid v. Nationstar Mtge., LLC*, 688 F.App'x 803 (11th Cir.2017) ( letters were not sent to induce payment because they did not reference a debt, demand payment, discuss a balance due on the underlying mortgage, or discuss ways to settle that balance. The court also found that the letters were sent in order to comply with a federal regulation).

### (c)   Mohr's FDCPA Claims Fail Because Shellpoint's Letters Were Informational And Contained Bankruptcy Disclaimers.

Mohr's FDCPA claims fail as a matter of law because Shellpoint's Letters were *informational*, not an *attempt to collect* any debt. The Letters contained language required by federal law and contained bankruptcy disclaimers that informed Mohr that Shellpoint was not attempting to collect any debt.

Neither the Seventh Circuit nor any federal district court in Indiana appears to have addressed this discrete issue in a reported opinion. But the other courts have uniformly adopted *Henriquez*, finding a hazard insurance notice containing a bankruptcy disclaimer to be informational rather than an attempt to collect a debt.

Absent binding precedent, this Court should adopt the *Henriquez* reasoning and dismiss the Complaint. The dual mandates of RESPA and Regulation X forced Shellpoint to walk a tightrope between complying with those guidelines and complying with the FDCPA. In that situation, Shellpoint's bankruptcy disclaimer was sufficient to inform Mohr that the Letters were informational rather than an attempt to collect. Shellpoint did as well as one could reasonably expect in this situation.

And in context, the Letters were not an attempt to collect. Shellpoint did not send repeat notices or more notices than RESPA required. The Letters do not reference the amount owed on the Mortgage Loan, the due date, or how to make payment on the Mortgage Loan. The Letters did not even give Mohr the option to pay Shellpoint for the force-placed insurance, or provide a procedure to make payment. The Letters simply asked for proof of insurance, encouraged Mohr to obtain insurance, warned of the effects, and advised him of the procedure to supply proof of insurance to Shellpoint.

And while Mohr alleges that Shellpoint *might* attempt to collect from him personally in the future, he does not allege any actual attempts. Taken together, the Letters merely informed Mohr that his insurance had lapsed and warned that Shellpoint would obtain more expensive coverage.

As a practical matter, the Property cannot sit uninsured. Given that Mohr did not insure the Property, Shellpoint had to buy coverage. And as it advised in the Letters, the lender-placed insurance is more expensive. As such, federal law required Shellpoint to inform Mohr of his choice: either obtain his own coverage or have Shellpoint obtain coverage on his behalf at an increased cost. While Mohr alleges that the force-placed insurance was too expensive, it is not as if Shellpoint kept this money or profited. Mohr's failure to insure the Property forced Shellpoint to obtain more expensive coverage, pay the premium to a third-party, and hope that it might be able to recover the cost from the sale proceeds in the Foreclosure. Shellpoint gained nothing from sending the Letters other than making sure the Property did not sit uninsured.

Given that the Letters were *informational* rather than an attempt to collect, Mohr's FDCPA claims fail as a matter of law, and the Court should dismiss the Complaint.

### C.    The Court Should Decline To Exercise Supplemental Jurisdiction Over Remaining State Law Claims.

Any claim that Shellpoint acted improperly in the Foreclosure is best addressed in the Foreclosure. This Court should thus decline supplemental jurisdiction over Mohr's state law claims under 28 U.S.C. §1367. After dismissing Mohr's FDCPA claim in Count One, there is no remaining claim over which the Court has original jurisdiction.[54]

---

[54] 28 U.S.C. §1367(c)(3).

Mohr's breach of contract claims revolves around a $6,115.20 insurance premium. Even if the parties have a diversity of citizenship, the amount-in-controversy will not exceed $75,000.00.[55]

As a practical matter, the state court is best equipped to address Mohr's state law claims that arose out of the foreclosure proceedings. In determining whether to exercise supplemental jurisdiction, the Court is to balance "the traditional 'values of judicial economy, convenience, fairness, and comity.'"[56] This usually results in dismissing the remaining claims.[57]

And this is not an unusual case that requires this court to retain jurisdiction. Mohr alleges that Shellpoint failed to expeditiously prosecute the case, and that it assessed improper insurance charges. His remedy, if any, lies in the state court. Shellpoint will presumably seek to recover its cost of force-placed insurance from the sale proceeds, so Mohr has the opportunity to raise this issue if and when that occurs. Mohr should have raised any dispute about the pace of the Foreclosure proceeding with the state court rather than asking this Court to second guess the state court judge's case management.

While this Court can simply decline supplemental jurisdiction and avoid engaging in the analysis, Mohr's breach of contract claims are barred. His claims in this case are based on the Foreclosure, and thus arise out of the same transaction or occurrence as the Foreclosure. To the extent that he is entitled to affirmative relief, those claims are compulsory counterclaims in the Foreclosure. His claims are thus barred by either (1) *res judicata,* if he failed to raise these claims or defenses in the

---

[55] 28 U.S.C. §1332(a).

[56] *Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 122 (7th Cir. 2006), citing 28 U.S.C. §1367.

[57] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Foreclosure, or (2) the *Rooker-Feldman* doctrine, if he raised these defenses and now asks this Court to serve as a *de facto* appellate court reviewing the state court. Regardless, this Court should decline jurisdiction over Counts Two and Three so as not to unnecessarily entangle itself with the pending Foreclosure.

### D.    Mohr's Breach Of Contract Claims In Counts Two And Three Of The Complaint Fail As A Matter Of Law.

Mohr's breach of contract claims also fails substantively. Mohr alleges that Shellpoint (1) breached the Mortgage by obtaining force-placed insurance on the Property, and (2) breached the Settlement Agreement from the 2018 Case because it did not act quickly enough in the Foreclosure to divest Mohr of his title to the Property. He vaguely alleges that *something* happened at the Property,[58] and that Shellpoint's alleged delay subjected Mohr, as the Property owner, to *potential* liability for undisclosed incidents at the Property.[59]

Mohr's allegations are implausible on their face. Shellpoint has the right under the Mortgage to obtain insurance on his behalf after he defaulted on the Mortgage. And Shellpoint did not unreasonably delay in foreclosing. He entered into the Settlement Agreement consenting to a foreclosure on August 28, 2018.[60] Shellpoint filed the Foreclosure on September 19, 2018.[61] Three weeks hardly constitutes an unreasonable delay. Even if the Court retains jurisdiction, Counts Two and Three fail as a matter of law, and should be dismissed.

---

[58] Complaint, ¶43 ("As a result of defendant's breach, plaintiff has been subjected to potential liability for incidents occurring at the property in question, and to the Homeowner's Association for the property.")
[59] *Id.*
[60] Complaint, ¶18.
[61] Complaint, ¶19.

### 1.   Mohr's Breach Of Contract Claim In Count Two Fails.

Shellpoint had the right to insure the Property after Mohr's default.   In the Mortgage, at §3, Mohr agreed to pay when due "premiums for any and all insurance required." And in §5, Mohr agreed to insure the Property, and allow Shellpoint to insure the Property if he did not.[62]  Mohr also agreed that Shellpoint's coverage might provide greater insurance and "that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained."[63]  Mohr admits he breached the Mortgage as a result of his Bankruptcy and payment default.[64] There is no dispute that Shellpoint had the right and the obligation to insure the Property.

But Mohr alleges that Shellpoint breached the Mortgage by obtaining an insurance policy at an increased cost, and assessing it against his Mortgage Loan account. He claims Shellpoint "obtained insurance in bad faith" by "purposefully selecting an exorbitantly-priced" policy that greatly exceeded the Property's value.[65] In his opinion, the Property is worth less than $125,000.00, and that the four units in his building would cost less than $769,236.00 to re-build.[66] In other words, Mohr objects to

---

[62] Mortgage, ¶5 ("If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.").
[63] *Id*.
[64] *Complaint*, ¶¶15, 19, 25.
[65] Complaint, ¶39.
[66] Complaint, ¶¶26, 27.

the policy because it is based on an insured value that is higher than his speculative opinion of the building's value.

Mohr's claim fails because the Mortgage allows Shellpoint to insure the Property at an increased cost. Therefore, even accepting Mohr's allegations as true, which the Court must at this stage, he fails to allege a breach.

Mohr also fails to allege any actual damages. He alleges that he was damaged by the "excessive charges for force-placed insurance that were assessed against the property."[67] He does not allege that he actually paid the premiums. In fact, he bases his entire FDCPA claim on the fact that he is not responsible for the premiums because he discharged his personal liability in the Bankruptcy. As a result, Mohr has not suffered any actual damages, and the Court should dismiss Count Two of the Complaint.

Finally, as a practical matter, when a condominium policy lapses, Shellpoint has to insure the entire building, not just Mohr's unit. And Shellpoint simply passes along the policy's cost. Shellpoint does not stand to gain by increasing the insurance cost.  In fact, it risks bearing the ultimate cost of insuring the Property, as it cannot seek to recover the premium from Mohr personally. Shellpoint would prefer that Mohr and/or his homeowner's association insure the property at their cost. Mohr's claim thus fails to rise above the speculative level, and fails to state a claim for relief.

### 2.    Mohr's Breach Of Contract Claim In Count Three Fails To State A Claim.

Finally, even if the Court exercises supplemental jurisdiction over Count Three, it should dismiss this claim. Taking the Complaint's allegations as true, Mohr fails to allege (1) what promise Shellpoint made, (2) what it did to breach that promise, and (3)

---

[67] *Complaint,* ¶ 40.

any actual damages.[68]  Mohr alleges that *something* happened at the Property, and that he *might* be liable in the future as a result. Mohr does not allege any facts that could plausibly give rise to a breach of contract claim, and thus fails to state a claim for relief.

## IV.    CONCLUSION

For the foregoing reasons, Defendant NewRez LLC f/k/a New Penn Financial, LLC d/b/a Shellpoint Mortgage Servicing respectfully requests that the Court dismiss the Complaint with prejudice.

OF COUNSEL:

GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45202
Phone: (513) 621-6464
Fax:    (513) 651-3836

Respectfully submitted,

/s/ Jeffrey J. Hanneken
Jeffrey J. Hanneken (31726-15)
*Counsel for Defendant NewRez, LLC, f/k/a*
*New Penn Financial, LLC d/b/a Shellpoint*
*Mortgage Servicing*
GRAYDON HEAD & RITCHEY LLP
312 Walnut Street
Suite 1800
Cincinnati, OH 45202
Phone: (513) 629-0349
Fax:    (513) 651-3836
E-mail: jhanneken@graydon.law

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing *Notice of Appearance* was filed via the CM/ECF system that will send notification to all counsel of record, this 15th day of July, 2019.

/s/ Jeffrey J. Hanneken
Jeffrey J. Hanneken (31726-15)

9599010.3

---

[68] *Murat Temple Ass'n v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1128-29 (Ind. Ct. App. 2011) ("The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages.").

STATE OF INDIANA
LAKE COUNTY
FILED FOR RECORD

2003 131175

2003 DEC 12  AM 10: 31

MORRIS W. CARTER
RECORDER

Return To:
Flagstar Bank, FSB

5151 Corporate Drive, Troy, Michigan  48098

Mail Stop W-530-3 ──────── ──[Space Above This Line For Recording Data]──

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 1, 2003
together with all Riders to this document.
(B) "Borrower" is BRIAN K. MOHR, an unmarried man

Borrower is the mortgagor under this Security Instrument.



INDIANA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3015  1/01

VMP®-6A (IN) (0005)
Page 1 of 15                    Initials: BKM

HOLD FOR FIRST AMERICAN TITLE



┌─────────────┐
│  **EXHIBIT**  │
│             │
│      A      │
└─────────────┘

(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the Mortgagee under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) "Lender" is
**Flagstar Bank, FSB**
Lender is a **Federally Chartered Savings Bank**
organized and existing under the laws of **The United States Of America**
Lender's address is
**5151 Corporate Drive, Troy, Michigan  48098**

(E) "Note" means the promissory note signed by Borrower and dated December 1, 2003
The Note states that Borrower owes Lender
**Forty-Six Thousand Eight Hundred  and 00/100ths**                     Dollars
(U.S. $ **46,800.00**         ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than December 1, 2033

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [x] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the **County** of **Lake** :

        [Type of Recording Jurisdiction]             [Name of Recording Jurisdiction]

UNIT 3 , BUILDING 16, THE COLONIES OF MERRILLVILLE CONDOMINIMUM, A HORIZONTAL PROPERTY REGIME, AS RECORDED AS DOCUMENT NO. 238215 UNDER THE DATE OF FEBRUARY 1, 1974, AND AMENDED BY DOCUMENT NO. 488399, RECORDED UNDER THE DATE OF SEPTEMBER 1, 1978, IN THE RECORDERS OFFICE OF LAKE COUNTY, INDIANA.



6964 FILLMORE
MERRILLVILLE
("Property Address"):

which currently has the address of
                                 [Street]
[City], Indiana  46410     [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

-6A(IN) (0005)                         Page 3 of 15           Initials:                Form 3015  1/01

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any;


-6A(IN) (0005)

Page 4 of 15

Initials: 

Form 3015  1/01

(c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or



ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and



Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing on the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.



-6A (IN) (0005)                                   Page 7 of 15                    Initials: _BKr_                  Form 3015  1/01

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by any insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).



-6A(IN) (0005)

Page 8 of 15

Initials: _BLW_

Form 3015  1/01

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if



-6A (IN) (0005)

Page 9 of 15


Initials:

Form 3015  1/01

acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's



change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)



-6A(IN) (0005)

Page 11 of 15

Initials: _B/W_

Form 3015 1/01

certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).



-6A(IN) (0005)                    Page 12 of 15                    Initials:                     Form 3015  1/01

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Valuation and Appraisement. Borrower waives all right of valuation and appraisement.



-6A(IN) (0005)
®

Page 13 of 15

Initials: _____

Form 3015  1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     BRIAN K. MOHR                  -Borrower

_____     _____ (Seal)
                                                                    -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                   -Borrower

_____ (Seal)     _____ (Seal)
                                -Borrower                                   -Borrower



-6A (IN) (0005)                   Page 14 of 15                   Form 3015  1/01

STATE OF INDIANA, Lake                                    County ss:

On this 1ST       day of December, 2003       , before me, the undersigned, a Notary Public
in and for said County, personally appeared  BRIAN K. MOHR, an unmarried man

and acknowledged the execution of the foregoing instrument.
WITNESS my hand and official seal.

My Commission Expires:

_____  Notary Public

Official Seal
ANDREA SULIVAN
Resident of Porter County, I County of Residence:
My commission expires
February 12, 2010

This instrument was prepared by:
Kelly Hurley
Flagstar Bank, FSB
16335 South Harlem 1W, Tinley Park, Illinois  60477



-6A(IN) (0005)                    Page 15 of 15          Initials:_____       Form 3015  1/01

# ADJUSTABLE RATE RIDER
(1 Year Treasury Index - Rate Caps)

THIS ADJUSTABLE RATE RIDER is made this 1ST                          day of December, 2003          ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage,
Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the
"Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
Flagstar Bank, FSB

(the "Lender") of the same date and covering the property described in the Security Instrument and
located at:
6964 FILLMORE, MERRILLVILLE, Indiana  46410

[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE
INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE
AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE
TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 4.375                    %. The Note provides for
changes in the interest rate and the monthly payments as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
(A) Change Dates
The interest rate I will pay may change on the first day of December, 2006                         ,
and on that day every 12th month thereafter. Each date on which my interest rate could change is called a
"Change Date."

MULTISTATE ADJUSTABLE RATE RIDER - ARM 5-2 -Single Family- Fannie Mae/Freddie Mac
UNIFORM INSTRUMENT
Fannie Mae 4-2/5-2/6-2 ARM
VMP-822R (0008).01    Form 3111 1/01
Page 1 of 4                    Initials: _Bll_
VMP MORTGAGE FORMS

**(B) The Index**
Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the weekly average yield on United States Treasury securities adjusted to a constant maturity of one year, as made available by the Federal Reserve Board. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**
Before each Change Date, the Note Holder will calculate my new interest rate by adding **Two and 875/1000** percentage points (**2.875** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**
The interest rate I am required to pay at the first Change Date will not be greater than **6.375** % or less than **2.875** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than two percentage points (2.0%) from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than **10.375** %.

**(E) Effective Date of Changes**
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.



-822R (0008).01

Page 2 of 4

Initials: _____

Form 3111 1/01

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

VMP®-822R (0008).01          Page 3 of 4          Initials: _BKw_          Form 3111 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)
                    -Borrower

_____ (Seal)
BRIAN K. MOHR        -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

_____ (Seal)
                    -Borrower

VMP-822R (0008).01              Page 4 of 4              Form 3111 1/01

# CONDOMINIUM RIDER

THIS CONDOMINIUM RIDER is made this 1ST day of December, 2003 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
Flagstar Bank, FSB

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
6964 FILLMORE, MERRILLVILLE, Indiana  46410

[Property Address]

The Property includes a unit in, together with an undivided interest in the common elements of, a condominium project known as:

[Name of Condominium Project]

(the "Condominium Project"). If the owners association or other entity which acts for the Condominium Project (the "Owners Association") holds title to property for the benefit or use of its members or shareholders, the Property also includes Borrower's interest in the Owners Association and the uses, proceeds and benefits of Borrower's interest.

CONDOMINIUM COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. Condominium Obligations. Borrower shall perform all of Borrower's obligations under the Condominium Project's Constituent Documents. The "Constituent Documents" are the: (i) Declaration or any other document which creates the Condominium Project; (ii) by-laws; (iii) code of regulations; and (iv) other equivalent documents. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy on the Condominium Project which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, from which Lender requires insurance,

MULTISTATE CONDOMINIUM RIDER-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

-8R (0008)          Form 3140 1/01
Page 1 of 3          Initials: _____
VMP MORTGAGE FORMS -

then:  (i)  Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender for application to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property, whether of the unit or of the common elements, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Condominium Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the Constituent Documents if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. Remedies. If Borrower does not pay condominium dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

Initials: _____

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Condominium Rider.

_____ (Seal)
                          -Borrower

_____ (Seal)
BRIAN K. MOHR              -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

-8R (0008)                  Page 3 of 3                    Form 3140 1/01

2015 054375

STATE OF INDIANA
LAKE COUNTY
FILED FOR RECORD

2015 AUG 13 AM 9: 36

MICHAEL B. BROWN
RECORDER

When Recorded Return To:
JPMorgan Chase Bank, NA
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683





## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS, WHOSE ADDRESS IS P.O. BOX 2026, FLINT, MI, 48501-2026, (ASSIGNOR), (MERS Address: 1901 E Voorhees Street, Suite C, Danville, IL 61834) by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 KANSAS LANE, MC 8000, MONROE, LA 71203 (866)756-8747, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Mortgage is dated 12/01/2003, and made by BRIAN K. MOHR to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS and recorded in Book n/a, Page n/a and Instrument # 2003 131175 in the office of the Recorder of LAKE County, Indiana .

Dated on _07,27,2015_ (MM/DD/YYYY)
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS

By: _____
Kelly McWilliams
ASST. SECRETARY

STATE OF LOUISIANA    PARISH OF OUACHITA
On _07,27,2015_ (MM/DD/YYYY), before me appeared _Kelly McWilliams_, to me personally known, who did say that he/she/they is/are the ASST. SECRETARY of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).

_____
EVA REESE

EVA REESE
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID # 17070

Notary Public - State of LOUISIANA
Commission expires: Upon My Death

Document Prepared By: Kelly McWilliams, JPMorgan Chase Bank, N.A., 780 Kansas Lane, Suite A,





STATE OF INDIANA
LAKE COUNTY
FILED FOR RECORD
2017 SEP 20 AM 9: 39
MICHAEL B. BROWN
RECORDER

2017 063738

When Recorded Return To:
JPMorgan Chase Bank
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, WHOSE ADDRESS IS 700 Kansas Lane, MC 8000, MONROE, LA 71203, (ASSIGNOR), by these presents does convey, grant, assign, transfer and set over the described Mortgage with all interest secured thereby, all liens, and any rights due or to become due thereon to NEW PENN FINANCIAL, LLC D/B/A SHELLPOINT MORTGAGE SERVICING, A DELAWARE LIMITED LIABILITY COMPANY, WHOSE ADDRESS IS 55 BEATTIE PLACE, MS # 100, GREENVILLE, SC 29601, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).

Said Mortgage is dated 12/01/2003, and made by BRIAN K. MOHR to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FLAGSTAR BANK, FSB, ITS SUCCESSORS AND ASSIGNS and recorded in Instrument # 2003 131175 in the office of the Recorder of LAKE County, Indiana. .

Dated on 05 /31 /2017 (MM/DD/YYYY)
JPMORGAN CHASE BANK, NATIONAL ASSOCIATION

By: _____
Keldrick Johnson Sr.
VICE PRESIDENT

STATE OF LOUISIANA    PARISH OF OUACHITA
On 05 /31 /2017 (MM/DD/YYYY), before me appeared ___ Keldrick Johnson Sr. _____ , to me personally known, who did say that he/she/they is/are the ___ VICE PRESIDENT ___ of JPMORGAN CHASE BANK, NATIONAL ASSOCIATION and that the instrument was signed on behalf of the corporation (or association), by authority from its board of directors, and that he/she/they acknowledged the instrument to be the free act and deed of the corporation (or association).



_____
Angela Ruth Payne
Notary Public - State of LOUISIANA
Commission expires: Upon My Death

ANGELA RUTH PAYNE
OUACHITA PARISH, LOUISIANA
LIFETIME COMMISSION
NOTARY ID # 60422

Document Prepared By: ___ Keldrick Johnson Sr. ___ , JPMorgan Chase Bank, N.A., 780 Kansas Lane, Suite A, Monroe, LA 71203, 800-401-6587

