# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

BRIAN MOHR,                )
                           )
        Plaintiff,      )
                           )
   vs.                     )   Case No. 2:19-cv-150-JTM-JPK
                           )
NEWREZ LLC, formerly known as )
NEW PENN FINANCIAL, LLC,   )
doing business as SHELLPOINT )
MORTGAGE SERVICING,        )
                           )
        Defendant.      )

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
## TO DISMISS AMENDED COMPLAINT

Daniel A. Edelman (IL 0712094)
Cathleen M. Combs (IL 0472840)
Tara L. Goodwin (IL 6297473)
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:
courtecl@edcombs.com

Defendant ("Shellpoint") sent Plaintiff a letter similar to one recently held to violate the Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA") in *Miller v. Carrington Mtge. Svcs., LLC*, 2:19cv16, 2019 WL 2871141 (D.Me. July 3, 2019). Shellpoint nevertheless insists that it did not violate the FDCPA and that Plaintiff's amended complaint ("FAC") should be dismissed. As set forth below, Shellpoint's arguments are without merit. Shellpoint told a consumer protected by the bankruptcy discharge that he had to pay money. Although required to tell Plaintiff that he had no personal obligation, Shellpoint failed to do so, instead making an obscure statement phrased as "to the extent that your obligation has been discharged . . . ."

**I.   FACTS**

This action concerns property in Merrillville, Indiana in which Plaintiff Brian Mohr formerly resided. (FAC, ¶8) Defendant Shellpoint is a "special servicer" of residential mortgage loans for others. A "special servicer" is one that services defaulted loans, as opposed to performing loans. (FAC, ¶11-12) Shellpoint uses the mails and telephone system in its special servicing business and is a debt collector as defined in the FDCPA. (FAC, ¶13-14)

Shellpoint began servicing Plaintiff's residential mortgage loan in August, 2017, after Plaintiff had been discharged from personal liability on the note in a Chapter 7 case. (FAC, ¶15) Plaintiff did not reaffirm the loan and the servicer at the time, Chase, obtained relief from the automatic stay to proceed with a foreclosure case, but never followed through with a foreclosure action. Plaintiff eventually vacated the property. (FAC, ¶16)

Plaintiff sued Shellpoint in January 2018 for violations of the FDCPA and Fair Credit Reporting Act, 15 U.S.C. §1681 et seq. ("FCRA"). Case No. 2:18-cv-00040 (N.D.Ind.). Plaintiff's 2018 case settled. Plaintiff agreed to a consent foreclosure and a foreclosure was filed in September 2018. However, nothing was done to advance the foreclosure for several months. (FAC, ¶19)

On February 19, 2019, Defendant sent Plaintiff the letter attached to the FAC as Exhibit A. (FAC, ¶20) Exhibit A demands information regarding homeowner's association hazard

insurance and threatens to impose force placed insurance on the property. Exhibit A also states that "You must pay us for any period during which the insurance we buy is in effect but you do not have insurance." (FAC, ¶21)

Plaintiff's counsel promptly contacted Defendant's counsel regarding the letter, noting that it violated the FDCPA, and inquired into the status of the foreclosure. Defendant's foreclosure counsel did send a new consent foreclosure document for Plaintiff to sign after Plaintiff's counsel's above communication (and approximately six months after the foreclosure case was filed), which Plaintiff signed and returned by March 21, 2019. There is no reason this document could not have been sent several months earlier. (FAC, ¶23)

On March 21, 2019, Defendant sent Plaintiff a second letter stating that it was a "second and final notice" regarding homeowner's association hazard insurance (FAC, Exhibit B), and again threatening to force place insurance at an estimated cost of $6,115.20 annually, that Plaintiff "must pay us for." (FAC, ¶24)

On March 22, 2019, an order was entered for an "In Rem Judgment and Decree of Foreclosure" in Lake County Superior Court. (FAC, ¶25)

On April 8, 2019, Defendant sent Plaintiff a third letter (FAC, Exhibit C) indicating that it had forced place insurance at a cost of $6,115.20, which would be charged to his escrow account, and that "Your monthly payments will be adjusted to cover this cost." The letter indicated an insured amount of not less than $739,236. (FAC, ¶26) The prior letters did not refer to the insured amount.

Plaintiff's former residence, a condominium unit, is worth less than $125,000. (FAC, ¶27) There are a total of 4 units in the building, the combined value of which is substantially less than $739,236. (FAC, ¶27)

Plaintiff was harassed and inconvenienced by these communications. Plaintiff feared Defendant was going to try to hold him liable for the force placed insurance, and that he would have to expend money defending himself against such claims. (FAC, ¶28)

In this action, Plaintiff contends that the sending of Exhibits A, B and C to the FAC violated 15 U.S.C. §§1692e, 1692e(2), and 1692e(10), by representing that the recipient is personally liable for a debt and must pay Defendant money when that was not true. (FAC, ¶30)

Exhibit A to the FAC states on p. 1 that the consumer has failed to provide proof of hazard insurance as required by the loan, that Shellpoint will purchase insurance, and that "*You must pay us* for any period during which the insurance we buy is in effect but you do not have insurance." (Emphasis added) There is no reference to bankruptcy until p. 3, entitled "Supplemental Information." Page 3 first states that "Shellpoint Mortgage Servicing is a debt collector. This letter is an attempt to collect a debt and any information obtained will be used for that purpose." The next line, which is no more prominent than the first, states that "*to the extent that your obligation has been discharged* . . . this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect such obligation." (Emphasis added) The third paragraph on p. 3 states that "If you desire to maintain your voluntary insurance policy," Shellpoint will advance the premium if you "agree in writing to reimburse the escrow advances through regular escrow payments" and "agree to escrow for the repayment of the advanced premium and to pay for future premiums necessary to maintain the required policy." The consumer is thus told that either "you must pay us" for the force placed insurance or you must agree to pay us for maintaining existing insurance.

Exhibit B to the FAC is very similar to Exhibit A, but quantifies the cost to Plaintiff: "The insurance we buy . . . Will cost an estimated $6,115.20 annually, which may be significantly more expensive than the insurance you can buy yourself." Thus, in addition to the statements in Exhibit A, the consumer is told that either you buy insurance yourself or pay us an estimated $6,115.20.

Exhibits A and B never state that Shellpoint is not seeking to hold Plaintiff personally liable for any amount. The letters could have easily stated at the outset that Shellpoint was not seeking to hold Plaintiff personally liable for any amount. Representing that "you must pay us"

except "to the extent that your obligation has been discharged" when Defendant knew full well that Plaintiff was not personally liable is confusing and misleading. The disclaimer should also not have been immediately preceded by a statement that the letter is an attempt to collect a debt.

The letters are particularly confusing because the debt in question is similar to some post-petition debts – such as association dues and real estate taxes – which one who continues in title *is* personally obligated to pay (to the condominium association and county). (FAC, ¶32)

Exhibit C to the FAC states that insurance has been obtained and falsely informed Plaintiff that "your monthly payments will be adjusted to cover this cost." It again states that "If you desire to maintain your voluntary insurance policy," Shellpoint will advance the premium if you "agree in writing to reimburse the escrow advances through regular escrow payments" and "agree to escrow for the repayment of the advanced premium and to pay for future premiums necessary to maintain the required policy." Exhibit C made no mention of the fact that the Plaintiff had no personal liability for the debt and was therefore not required to make any monthly payments. (FAC, ¶33)

Shellpoint's brief underscores the misleading nature of Exhibits A-C when it claims that what Shellpoint *really* meant when it said "You must pay us . . . ." was that it had "the right to hold Mohr responsible for hazard insurance and recover the costs of obtaining such insurance from the foreclosure sale proceeds" if "the Property sells at a foreclosure sale for more than the amount owed on the mortgage". (Def.Br., p. 9) There is no way that the unsophisticated consumer would discern *that* meaning from documents stating that "You must pay us . . . ", that "This letter is an attempt to collect a debt and any information obtained will be used for that purpose" and that "your monthly payments will be adjusted to cover this cost." Shellpoint could readily have stated in its letters exactly what it says in its brief, but chose not to do so.

Plaintiff further complains that delaying the foreclosure of the property for six months, after Plaintiff had agreed to a consent foreclosure, was an unfair practice under 15 U.S.C. §1692f (FAC, ¶34), and that sending letters threatening to make Plaintiff pay for insurance expenses on

the property when Defendant has been dragging its feet for years on foreclosing is an unfair practice in violation of 15 U.S.C. §1692f. (FAC, ¶35)

Finally, adding an excessive amount of force placed insurance which was charged against Plaintiff's property is a deceptive and unfair practice in violation of 15 U.S.C. §1692f (FAC, ¶36) and a breach of both the note and mortgage and the settlement agreement. (FAC, ¶38-39, 43)

## II. DEFENDANT'S LETTERS SOUGHT MONEY, FAILED TO CONTAIN A COHERENT BANKRUPTCY DISCLAIMER, AND WERE NOT AUTHORIZED BY RESPA

Defendant insists that Exhibits A-C were merely "informational" and not an attempt to induce Plaintiff to pay money. Defendant further claims that the language of its documents was required by 15 U.S.C. 2605(*l*)(1) and implementing CFPB regulations. Section 2605(*l*)(1) states that "A servicer **_may not impose any charge on any borrower_** for force-placed insurance with respect to any property securing a federally related mortgage unless" notices are provided. (Emphasis added) Defendant claims that this language justifies its conduct even though Defendant supposedly was not attempting to impose any charge on Plaintiff!

In *Miller v. Carrington Mortg. Servs., LLC, supra,* 2019 WL 2871141, at *6–7 (D. Me. July 3, 2019), the court rejected the identical argument:

> Carrington Mortgage argues that the force-placed hazard insurance letters are not debt collection because Carrington Mortgage was required to send the letters under RESPA and the letters that it sent were in a form approved by the Consumer Financial Protection Bureau.6 Although RESPA and Regulation X require a loan servicer to provide written notices containing specified information to a debtor before purchasing force-placed hazard insurance, they do not mandate that those notices contain specific language. See 12 U.S.C.A. § 2605(l)(1); 12 C.F.R. § 1024.37(c)(2). The first page of each force-placed insurance letter that Carrington Mortgage sent to Miller mirrors a model force-placed insurance notice form promulgated by the CFPB. Compare ECF No. 1-4 at 1, with App'x MS-3 to 12 C.F.R. Part 1024, Model MS-3(D); compare ECF No. 1-7 at 1, with App'x MS-3 to 12 C.F.R. Part 1024, Model MS-3(B). But the fact that Carrington Mortgage followed the CFPB's form letters in part does not establish that the letters do not constitute debt collection under the FDCPA, especially when viewing the letters "from the perspective of the hypothetical unsophisticated consumer." Pollard, 766 F.3d at 103.
>
> The "[y]ou must pay us" language that appears in Model MS-3(B), see App'x MS-3 to 12 C.F.R. Part 1024, Model MS-3(B), and Carrington Mortgage's letter to Miller dated

September 24, 2018, see ECF No. 1-7 at 1, may be entirely appropriate in the average case where a debtor has failed to maintain hazard insurance. But that same language may nevertheless be inappropriate when a loan servicer is sending the letter to a debtor who has been discharged in bankruptcy. It is plausible that an unsophisticated consumer reading that language would understand the letter to be a demand for payment. Furthermore, Carrington Mortgage did not send only the language that appears in the form letters, but added additional pages to the letters, including language on the second page that informs the recipient that the cost of the policy either has or will be "charged to you" and that the person is or will be "responsible to pay for such amounts." ECF No. 1-4 at 2; ECF No. 1-7 at 2. That language further reinforces the impression that the purpose of the letter was to induce payment. It is also noteworthy that the letters do not include a bankruptcy disclaimer on the first page; instead, a generic bankruptcy disclaimer appears several pages into each letter. See ECF No. 1-4 at 5; ECF No. 1-7 at 4.

Finally, some courts have concluded that a force-placed hazard insurance letter must induce payment by the debtor on the underlying mortgage debt for the letter to constitute debt collection under the FDCPA. *See, e.g., McCamis v. Servis One, Inc.*, No. 8:16-CV-1130-T-30AEP, 2016 WL 4063403, at *3 (M.D. Fla. July 29, 2016). But under the FDCPA, a "debt" is defined as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes[.]" 15 U.S.C.A. §1692a(5). Hazard insurance is an obligation to pay money that arises out of the mortgage transaction between the creditor and the debtor. Therefore, a demand for payment of hazard insurance is fairly treated as debt collection under the FDCPA.

I therefore conclude that the Complaint plausibly alleges that the force-placed hazard insurance letters constitute debt collection under the FDCPA.

In *Kowalski v. Seterus, Inc.,* 2:16cv00160, 2017 WL 79949, at *13 (D. Me. Jan. 9, 2017), a hazard insurance letter was sent to a borrower who had likewise obtained a discharge in bankruptcy and vacated the mortgaged property. The court held that because the plaintiff no longer had any personal liability on the note, the insurance letters, which could induce him to make a payment for a premium he didn't owe, violated the FDCPA. *Id.* at *8.

In *In re Thomas,* 554 B.R. 512 (Bankr. M.D.Ala. 2016), which Shellpoint erroneously claims supports it (Def.Br., p. 11), a debtor in a pending Chapter 7 sought to have Chase held in contempt for sending letters notifying the debtor that insurance may be force placed. Contempt requires wilfulness and, unlike the FDCPA, is not a strict liability violation. The *Thomas* court held that communications would be considered informational if there was a valid purpose in sending them to the consumer and they did not demand or coerce payment. However, if "a

debtor surrendering property could offer the mortgagee a deed in lieu of foreclosure," and the mortgagee did not take it, "any subsequent 'informational' communications would lose the validity of their purpose" and "become harassing and violative of the automatic stay." (554 B.R. at 519-20) That, of course, is precisely the situation here, where Plaintiff's personal liability was extinguished, Plaintiff had consented to a foreclosure judgment and Shellpoint sent letters stating "You must pay . . . ."

In addition, *Thomas* required that any "informational" communication have a "prominent and unambiguous" disclaimer of any intent to collect (554 B.R. at 520), finding a much clearer disclosure than that involved here to be "underwhelming." (554 B.R. at 523) Here, we have a vague invitation for the consumer to determine to what "extent" his obligation to pay may have been discharged.

Other decisions emphasize that a "prominent and unambiguous disclaimer" is absolutely essential to have a communication classified as "informational." *In re Sciortino*, 561 B.R. 260, 273 (Bankr. N.D. Ga. 2016). For example, in *In re Henriquez,* 536 B.R. 341, 348 (Bankr. N.D.Ga. 2015) (Def.Br., pp. 12-13), which Shellpoint urges the Court to follow, the court held that a servicer was not in contempt of a discharge injunction when it sent an insurance notice with a clear statement that "Defendant was not attempting to collect against the Plaintiffs personally if the Loan was discharged in bankruptcy."

A disclaimer similar to that used by Shellpoint here was held to be inadequate in
*In re Jackson,* No. 14-3568, 2017 WL 1102849, at *3 (Bankr. S.D. Ala. Mar. 23, 2017):

> This letter is part of Flagstar's debt collection process. All information obtained relating to this letter will be used for that purpose. However, if you are under the protection of the bankruptcy court or have been discharged as a result of a bankruptcy proceeding, this notice is given to you under a statutory or contractual requirement and for informational purposes and is not intended as an attempt to collect a debt or as an act to collect, assess, or recover all or any portion of the debt from you personally *except as allowed by law*. (Emphasis added)

An unsophisticated consumer will know if he or she received a bankruptcy discharge, but is not expected to know the answer to legal questions such as to what "extent" his obligation to pay

may have been discharged or what is "allowed by law." *Lox v. CDA, Ltd.*, 689 F.3d 818, 825 (7th Cir. 2012). Indeed, telling financially distressed consumers that they are in need of legal assistance is itself a substantial threat.

Courts have held that FDCPA claims were stated even where there was a reasonable bankruptcy disclaimer, if it was overshadowed by demands for payment. *Gagnon v. JPMorgan Chase Bank*, 563 B.R. 835, 843-46 (N.D.Ill. 2017).

Here, not only was the bankruptcy disclaimer confusing, but Defendant's letters explicitly state that Plaintiff "must pay" for the hazard insurance premium. It is a matter of common sense that a creditor who tells a debtor that they must pay a certain amount seeks to collect that amount. As the court in *In re Perviz,* 302 B.R. 357, 372 (Bank. N.D.Ohio 2003), noted, "letters informing the Debtors that they were liable for the payment of insurance on a house that they had both abandoned in bankruptcy and physically vacated, would undoubtedly have been met with some degree of consternation by a similarly situated debtor."

### III. DEFENDANT'S CASES DO NOT SUPPORT ITS POSITION.

Shellpoint cites (Def.Br., p. 11) *Preuher v. Seterus, LLC,* 14cv6140, 2014 WL 7005095 (N.D.Ill., Dec. 11, 2014), involving two debtors in a pending Chapter 13 who remained in the mortgaged residence, remained obligated on the loan – although the obligation had to be enforced through the bankruptcy court – and were attempting to bring themselves current. Servicer Seterus sent a letter stating that it did not have proof of hazard insurance. The letter stated that "if you are in bankruptcy" it was not an attempt to collect. Unlike the present case, the letter did not seek to enforce a discharged debt, it did not contain obfuscatory language asking the consumer to figure out to what "extent" the discharge applied, and there were no subsequent communications. The court held that the particular letter was not an attempt to collect.

Similarly, in *Elliott v. PHH Mtge Corp.,* 15cv1221, 2017 WL 10153593, *2 (N.D.N.Y., March 3, 2017) (Def.Br, p. 12), force placed insurance notices stated that "if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, [lender] will

only exercise its rights against the property and is not attempting any act to collect the discharged debt from you personally." The court held that a post-bankruptcy notice must "include an unambiguous and conspicuous disclaimer that the document is not an attempt to collect *in personam*, but rather, part of collection *in rem* against collateral." (*5)

*Preuher* and *Elliott* do not help Defendant here, where there was no longer any personal obligation, the letters stated "You must pay . . . ." and the language about whether a bankruptcy discharge applied required the consumer to answer a question of law.[1]

Other cases cited by Shellpoint are further afield. Shellpoint cites *Shelley v. Ocwen Loan Servicing, LLC,* 1:13cv506, 2013 WL 4584649 (S.D.Ind., Aug. 28, 2013), a case involving a notice advising the borrower that servicing of the loan had been transferred, for the proposition that "for a demand of money to be made, the recipient of the demand must be informed what amount is owed." (Def.Br., p. 7 n. 31) However, in *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385 (7th Cir. 2010), the Seventh Circuit held that a demand for payment was **not** in itself determinative of whether a communication was made in collection with a debt collection. Furthermore, in this case all three letters state that the consumer has defaulted (by failing to maintain insurance), Exhibit B states an estimated amount to remedy the default, and all three letters suggest that Plaintiff may continue his existing policy (with a known premium) if he agrees in writing to pay Shellpoint. In contrast, the notice in *Shelley* was a form sent to all persons whose servicing was transferred.

Shellpoint also cites *Thompson v. BAC Home Loans Svcg., L.P.,* 2:09cv311, 2010 WL 1286747 (N.D.Ind., March 26, 2010), which also involved a transfer of servicing notice sent to all persons whose loans were transferred. "There is no indication that the Defendants are undertaking collection efforts for missing or late payments." (*4) Again, this is not the case here.

---

[1] Defendant cites several other cases involving clear bankruptcy disclaimers, none of which told the consumers that they had to determine to what "extent" their obligation was discharged. *E.g., Lovegrove v. Ocwen Loan Servicing, LLC*, 7:14cv329, 2015 WL 5042913 (W.D.Va., Aug. 26, 2015).

Shellpoint cites *Gillespie v. Chase Home Finance, LLC*, 3:09cv191, 2009 WL 4061428 (N.D.Ind., Nov. 20, 2009), which held that letters sent to defaulted borrowers advising of workout options was not an attempt to collect. A year later the Seventh Circuit held otherwise, in *Gburek, supra.*

Shellpoint cites *Bailey v. Security Nat'l Servicing Corp.* 154 F.3d 384 (7th Cir. 1998), which involved a loan that had been in default, but had been rehabilitated and a new payment schedule agreed upon. The new servicer sent the borrower a letter with dates and instructions for making future payments under the new schedule. The court held that the new servicer was not attempting to collect a defaulted debt, but that a different result would follow if an attempt was made to collect the underlying debt that had been rehabilitated. It is not in point here, where no debt was rehabilitated.

Shellpoint cites *Brand v. Caliber Home Loans, Inc.*, 16cv3432, 2018 WL 4895752 (N.D.Ill., Oct. 9, 2018), which insofar as pertinent involved borrowers who had been discharged in bankruptcy and who changed attorneys in the middle of dealing with Caliber. Upon noting that the original attorney no longer represented the borrowers, someone at Caliber sent them a form "Attorney letter" noting that the borrowers were no longer represented by counsel and stating, "please be advised that all collections and account correspondence regarding the above-referenced account will now resume" unless the debt had been discharged. Immediately thereafter Caliber sent a second letter acknowledging representation by the new attorney. There was no demand for money or statement that the borrowers were obligated. The court determined that this obviously erroneous communication was not sent to collect a debt.

The issue is whether an unsophisticated consumer could believe that Shellpoint was asking for payment of money. Clearly, that is the case here.

## IV. PLAINTIFF'S CONTRACT CLAIMS ARE NOT EVEN COGNIZABLE IN THE CONSENT FORECLOSURE, MUCH LESS BARRED BY IT

Shellpoint claims that any contract claims Plaintiff has regarding the excessive amount of force placed insurance are only cognizable in the consent foreclosure. Plaintiff agreed to a consent foreclosure in August 2018 and a foreclosure was filed in September 2018. On March 22, 2019, an order was entered for an "In Rem Judgment and Decree of Foreclosure" in Lake County Superior Court. (FAC, ¶25) Shellpoint did not state the amount of the force placed insurance coverage – $739,236 on a unit worth about $125,000 and in a building containing four similar units – until its letter of April 8, 2019, sent *after* the judgment.

Given these dates, Shellpoint's arguments are frivolous. A claim arising after judgment is not a "compulsory counterclaim" – Indiana law is that "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject-matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." Ind. R. Trial P. 13. A claim arising after Mr. Mohr has consented to judgment and the court has entered that judgment does not meet this definition. "Supplemental pleadings," concerning matters that arose after the original time for pleading, are always optional, not mandatory. Ind. R. Trial. P. 15(D); *International Rectifier Corp. v. IXYS Corp.,* 383 F.3d 1312, 1317 (Fed. Cir. 2004); *Manning v. City of Auburn,* 953 F.2d 1355, 1359–60 (11th Cir. 1992).

A judgment is not "res judicata" with respect to a demand for money made for the first time after judgment is entered. *Manning v. City of Auburn, supra,* 953 F.2d at 1359–60.

The Rooker-Feldman doctrine does not bar such a claim, either. *Molina v. Aurora Loan Servs., LLC,* 635 F. App'x 618, 622 (11th Cir. 2015) ("her principal claim—that the Defendants discriminated against her during the loan modification process—was not addressed by the foreclosure judgment, nor could it have been since the alleged discrimination occurred after the

state foreclosure judgment had been rendered. Rooker–Feldman did not bar those post-judgment discrimination claims"), citing *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) ("If a federal Plaintiff presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court.").

Shellpoint also claims that it was not required to act promptly and that it did not delay unreasonably in foreclosing. Shellpoint notes the three weeks between the consent to the foreclosure and the filing of the action, but ignores the six months that the action sat afterward. Unreasonable delay presents a question of fact. To the extent Shellpoint is complaining that Plaintiff was not specific enough about the contract being breached – Plaintiff's complaint was intentionally vague because the contact in question is confidential. If this Court believes more detail is needed, Plaintiff proposes that Shellpoint either waive confidentiality or that Plaintiff be allowed to file a second amended complaint under seal.

Shellpoint also claims that the premium was not excessive and that it had an insurable interest in the entire condominium building, but the coverage stated in the April 8, 2019 letter greatly exceeded the value of Mr. Mohr's unit, and there is nothing in the complaint that would suggest that Shellpoint either had an insurable interest in the entire building or that coverage for the other units had lapsed.

Finally, Shellpoint disputes Plaintiff's allegations of damage in FAC ¶¶40 and 43, but that raises an issue of fact. The allegations are perfectly plausible – delay in taking title to the condominium unit means that Mr. Mohr continues to be liable for taxes, association dues, and the like. Furthermore, both of Plaintiff's contract claims seek declaratory relief as to what amounts if any Plaintiff may owe, which does not require damage.

## V. CONCLUSION

For the reasons stated, the Court should deny Shellpoint's motion to dismiss.

Respectfully submitted,

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (IL 0712094)
Cathleen M. Combs (IL 0472840)
Tara L. Goodwin (IL 6297473)
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:
courtecl@edcombs.com

## **CERTIFICATE OF SERVICE**

  I, Daniel A. Edelman, hereby certify that on August 5, 2019, I caused a true and accurate copy of the foregoing document to be filed via the courts CM/ECF online system, which sent notice via email to all counsel of record.

                  */s/Daniel A. Edelman*
                  Daniel A. Edelman

Daniel A. Edelman (IL 0712094)
Cathleen M. Combs (IL 0472840)
Tara L. Goodwin (IL 6297473)
EDELMAN, COMBS, LATTURNER
   & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:
courtecl@edcombs.com